HONORABLE RICHARD A. JONES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NATHANIEL CAYLOR, et al.,

        Plaintiffs,

    v.

THE CITY OF SEATTLE, et al.,

        Defendants.

CASE NO. C11-1217RAJ

ORDER

## I.  INTRODUCTION

      This matter comes before the court on Defendants' motions for summary judgment.  The court heard oral argument on April 23, 2013.  For the reasons stated herein, the court GRANTS one motion (Dkt. # 65) in part and DENIES it in part and DENIES the other motion (Dkt. # 62).  As to the issues that survive summary judgment, trial will begin June 3.

## II.  BACKGROUND

      Because this matter comes before the court on motions for summary judgment, the court recounts the facts by resolving all material disputes of fact in favor of Plaintiff Nathaniel Caylor and his minor son, and by taking all inferences from the evidence in Plaintiffs' favor.  *Flint v. Dennison*, 488 F.3d 816, 825-26 (9th Cir. 2008).

**A.  The May 22, 2009 Shooting Incident**

      Just after 10:00 a.m. on May 22, 2009, Seattle Police Department ("SPD") dispatch relayed a report from a 911 caller of a suicidal man inside a Greenwood

ORDER – 1

apartment.  Dispatch reported that the man had his 20-month-old son with him, and that he had been saying for two days that he was going to kill himself.  Dispatch stated that the caller did not know if the man had any weapons, and that the caller was waiting outside the apartment.

Scott Miller was the first SPD officer to arrive at the apartment building.  There he found Carolyn Stillabower, the woman who had made the 911 call.  She explained that she was the sister of Carolyn Rhodes, who had died about a month before.  She explained that the man in the apartment was Nathaniel Caylor, and that he had been despondent since the death of Ms. Rhodes, who was the mother of his young son.  She explained that Mr. Caylor and the boy had been alone in the apartment since that morning, when she had tried unsuccessfully to take the boy from the apartment.  Ms. Stillabower repeated that she did not know if Mr. Caylor had weapons.  Ex. D (Miller Dep. at 37).[1]  Although she provided more detail, her account of the situation was not materially different from the facts that dispatch had conveyed.  Ofc. Don Leslie, who spoke separately to Ms. Stillabower when he arrived on the scene 15 to 20 minutes later, says that she told him it was possible that Mr. Caylor owned "an old muzzle loader handgun" that he kept in the apartment.  Ex. F (Leslie Dep. at 13, 18).

Ms. Stillabower escorted Ofc. Miller past the common door of the apartment complex and took him to the front door of Mr. Caylor's apartment, which was the last unit at the end of a hallway.  Ofc. Miller knocked on the door, but no one responded.  Ofc. Miller heard noises that he attributed to the boy, but did not believe the boy was in distress.  Ex. D (Miller Dep. at 42, 44).

Shortly thereafter, Ofc. Walter Bruce arrived on the scene and reported to Miller that he had seen a man through the exterior apartment windows.  *Id.* at 41.  Ofc. Miller

---

[1] Unless otherwise noted, the court cites evidence from the declaration of Evan Bariault (Dkt. # 66) and the declaration of David Whedbee (Dkt. # 80).  The Whedbee declaration attaches numbered exhibits; the Bariault declaration attaches lettered exhibits.

ORDER – 2

knocked again, this time using Mr. Caylor's name and demanding entry. *Id.* at 44.  In what would be a model for his communication that day, Mr. Caylor used profanity to tell the officers to leave him alone. Ex. 3 (Caylor Dep. at 155 ("I think I said 'Go the fuck away,' probably, or something along those lines.")).  He also warned the officers that if they tried to force entry, they might hurt his son:

> I told them that my son kept coming over to the door because they kept knocking on it and that if they were to kick the door he would be pinched, you know, crushed by … he would have been just smashed so I told them that my son was there, that they would hurt him if they kicked the door in.

Ex. B (Caylor Dep. at 91-92).

By the time Ofc. Eugene Schubeck arrived on the scene, Sgt. Steve Hirjak and Ofc. Tammie Case had arrived. Ex. H (Schubeck Dep. at 29).  Ofc. Hirjak was, at the time, an acting sergeant, and served as the officer in charge of the incident. *Id.* at 29.  It is not clear exactly what information Ofc. Schubeck received when he arrived.  Ofc. Schubeck was not clear, for example, as to what Ofc. Miller told him about the possibility officers would hurt the boy if they forced entry.

| | |
|---|---|
| SCHUBECK: | [T]he information that [Ofc. Miller] gave me was that the boy was on the other side of the door and that Caylor had placed him there and had said that . . . the boy would get hurt if we came through the door. |
| COUNSEL: | Did Officer Miller convey to you that Mr. Caylor's words were a warning or were they a threat? |
| SCHUBECK: | He didn't say. |
| COUNSEL: | Did he say that Mr. Caylor said, "If you come in here you might hurt my small child." |
| SCHUBECK: | He didn't say.  Officer Miller told me that Caylor had told them that if we tried to come into the door, the boy was in front of the door and that if we tried to come in the door, the boy would be hurt. |

Ex. H (Schubeck Dep. at 32).  The other officers told Ofc. Schubeck that Mr. Caylor did not want officers in his apartment. *Id.* at 33.  Ofc. Schubeck could hear Mr. Caylor

ORDER – 3

"yelling" or "ranting" from the other side of the front door, and could hear what he perceived as the boy "tapping on the door." *Id.* at 33-34.

At Sgt. Hirjak's direction, Ofc. Schubeck took a position just outside the end of the hallway on the landing of a common exterior staircase. *Id.* at 29-30. Photographs and diagrams at oral argument demonstrated that the landing was a half-flight of stairs up from Mr. Caylor's front door, but not far from the front door. The landing overlooked a patio that Mr. Caylor's apartment unit opened onto via a sliding glass door. A high, solid fence enclosed the patio. The landing where Ofc. Schubeck stood was very close to the patio, and afforded a clear view of the patio, but not the inside of the apartment. From that vantage point, the court estimates based on the photographs and diagrams that Ofc. Schubeck was no more than 20 feet from the patio, although he was separated from the patio not only by the fence, but by a railing surrounding the landing. In addition, the bottom of the patio of the apartment unit above Mr. Caylor's was overhead, such that the gap between Mr. Caylor's patio fence and the bottom of the patio above was only a few vertical feet. It was through that gap that Ofc. Schubeck looked down on the patio.

When Ofc. Schubeck first observed the patio, no one was there. *Id.* at 39. He could hear Mr. Caylor inside the apartment, "angrily yelling" that the officers should go away. *Id.* at 40. He did not, however, hear Mr. Caylor threaten either himself, his son, or the officers. Ex. 2 (Schubeck Dep. at 40-41). Eventually, Ofc. Miller summoned him back to the front door. *Id.* at 43-44. Ofc. Schubeck, like several other officers, reports that he heard a sound consistent with the presence of a firearm. *Id.* at 50 ("I heard [a] noise that sounded like a firearm being cycled."); *see also* Ex. G (Case Dep. at 66) ("It sounded like a gun being racked."), Ex. D (Miller Dep. at 55 ("It sounded like someone placing a shotgun shell into the chamber of a shotgun and . . . pumping it . . . ."), Ex. I (Bright Dep. at 36-37) (describing a "two-part clicking noise" that "sounded like a gun being cycled").

ORDER – 4

1    At some point, although it is not clear when, Sgt. Hirjak told all officers on the

2 scene, via radio, that they should cease contact with Mr. Caylor while they awaited the

3 arrival of a SWAT and hostage negotiation team.  Jackson Decl. (Dkt. # 64), Ex. 2

4 (Hirjak Dep. at 40-42).  Ofc. Schubeck, who had turned down his radio to better hear Mr.

5 Caylor, denies that he heard that communication.  Ex. 2 (Schubeck Dep. at 51-55).

6    Ofc. Schubeck moved back to the landing, where he found Mr. Caylor on the patio

7 with his son.  Ex. H (Schubeck Dep. at 55-56).  Mr. Caylor was smoking a cigarette and

8 was verbally combatative when Ofc. Schubeck tried to begin a conversation.  *Id.* at 56.

9 He told Ofc. Schubeck that if the officers tried to come in, they would be in for "a hell of

10 a fight."  *Id.*  Although the timing is not clear, Mr. Caylor admits that at some point he

11 said "if you kick my fucking door in you're going to hurt my kid and then you're going to

12 have one big angry father on your hands and then you're going to be in for the fight of

13 your fucking life."  Ex. 3 (Caylor Dep. at 100).  Despite Mr. Caylor's anger, his son was,

14 in Ofc. Schubeck's words "just playing with [an electric screwdriver that] was probably a

15 toy to him, so he wasn't crying, he wasn't speaking, he was just walking around on the

16 patio, just not really paying attention to what was going on . . . ."  Ex. H (Schubeck Dep.

17 at 57).  It appears that Ofc. Schubeck had his sidearm drawn throughout his initial visual

18 contact with Mr. Caylor.  Ex. 3 (Caylor Dep. at 96);

19    Mr. Caylor and the boy left the patio and returned to the interior of the apartment.

20 When Mr. Caylor next looked at Ofc. Schubeck (perhaps by sticking his head out the

21 patio door) Ofc. Schubeck was holding his firearm.  At that point, Mr. Caylor used the

22 phrase "suicide by cop."  The context in which he used the phrase is disputed.  Mr.

23 Caylor claims that when he saw the sidearm, he said: "Are you going to fucking shoot me

24 and go to lunch, suicide by cop?"  Ex. 3 (Caylor Dep. at 105-106).  According to Ofc.

25 Schubeck, Mr. Caylor asked him to shoot, pointing at his head and saying, "Suicide by

26 cop sounds like a good idea."  Ex. H (Schubeck Dep. at 86).

27

28 ORDER – 5

1    After that, Mr. Caylor was out of view of Ofc. Schubeck.  Ofc. Leslie joined him

2   on the landing.  Ofc. Schubeck told Ofc. Leslie that if Mr. Caylor returned to the patio,

3   Ofc. Schubeck would shoot him rather than allow him to go back inside.  Ex. H

4   (Schubeck Dep. at 103); Ex. 2 (Schubeck Dep. at 107).  Ofc. Leslie's response was

5   "Don't miss."  Ex. 2 (Schubeck Dep. at 107).  The two officers had no other discussion

6   about Ofc. Schubeck's plan to shoot.  Neither Ofc. Leslie nor Ofc. Schubeck

7   communicated that plan to any other officer.

8    Mr. Caylor returned to the patio without his son.  Ofc. Schubeck had his sidearm

9   pointed at Mr. Caylor, whereas Ofc. Leslie had his sidearm in "low ready" position.  Ex.

10   1 (Leslie Dep. at 18).  Ofc. Leslie attempted to engage Mr. Caylor in conversation.

11   Among other things, he asked Mr. Caylor if he had any guns in the apartment, to which

12   Mr. Caylor responded, "Yeah, there's an old fucking 20-gauge in there."  Ex. 3 (Caylor

13   Dep. at 103).  Ofc. Leslie attempted to discuss Ms. Rhodes' death, which angered Mr.

14   Caylor further.  *Id.* at 106.  He uttered a string of expletives, then turned to go back

15   inside.  *Id.* at 106-07.  Before he could reenter, Ofc. Schubeck fired a shot that hit Mr.

16   Caylor in his lower jaw.  Neither Ofc. Schubeck nor Ofc. Leslie warned Mr. Caylor that

17   they would shoot, and neither officer ordered Mr. Caylor to stay on the patio.

18    After Ofc. Schubeck fired the shot, the officers at the front door forced entry,

19   finding Mr. Caylor bleeding on the apartment floor.  They gave him medical treatment,

20   arrested, him, and sent him to the hospital.

21    Before moving from the shooting incident to its aftermath, the court emphasizes

22   again that it has summarized the facts by resolving all disputes in Mr. Caylor's favor.

23   There are significant disputes, particularly with regard to what Mr. Caylor said about the

24   weapons in his home.  According to Mr. Caylor, he made only a single reference to a

25   weapon, when he told Ofc. Leslie that he had an old 20-gauge shotgun in the apartment.

26   Ex. 3 (Caylor Dep. 101).  Ofc. Schubeck, however, reports that Mr. Caylor yelled

27

28   ORDER – 6

through the front door that if officers tried to enter, they would "get a 20-gauge slug through the door." Ex. H (Schubeck Dep. at 45). He repeated essentially the same threat when Ofc. Schubeck saw him on the patio, this time adding that his shotgun was "just inside the doorway." Ex. 2 (Schubeck Dep. at 179-80); *see also* Ex. 1 (Leslie Dep. at 18, 71). And according to Ofc. Schubeck, when Mr. Caylor turned to go inside just before the shot, he said, "Fuck you guys, I'm getting my gun." Ex. H (Schubeck Dep. at 109). Ofc. Leslie did not hear Mr. Caylor make that threat, and Mr. Caylor denies saying anything about a weapon when he tried to reenter the apartment. Ex. 1 (Leslie Dep. at 136-37), Ex. 3 (Caylor Dep. at 107). Although Mr. Caylor does not squarely deny all of the officers' assertions regarding his statements about weapons, the court finds that his statement that his *only* comment about a firearm was his admission to Ofc. Leslie that he had an old shotgun is sufficient to place all of the officers' contrary statements in dispute. *Cf. Blanford v. Sacramento County*, 406 F.3d 1110, 1113 n.3 (9th Cir. 2005) (noting that court considering summary judgment may accept officers' version of plaintiff's conduct where plaintiff merely testifies that he does not remember a particular act).

**B.    The Aftermath of the Shooting**

Mr. Caylor underwent at least one surgery, and was in the hospital until June 5.

After his release from the hospital, Mr. Caylor was taken to jail. He had been charged with felony harassment and reckless endangerment.

On May 26, while Mr. Caylor was still hospitalized, Detective Jeffrey Mudd, who was partially responsible for investigating the incident, contacted Child Protective Services ("CPS"). Ex. 21. He described the May 22 incident to the CPS intake representative. The representative reports that Det. Mudd reported a version of events in which Mr. Caylor had first used his son as a human shield at the front door, and later directly threatened to kill his son. According to the intake report, Det. Mudd stated that Mr. Caylor "was going to put the child in front of the door and if anyone came in they

ORDER – 7

would be killing the child," and also that Mr. Caylor "said he was going to kill himself and anyone who came in the door[,] including the child." *Id.*  A CPS representative repeated those allegations the next day in dependency petition filed in King County Superior Court.  Ex. 20.  The petition led to a June 1 order placing Mr. Caylor's son in the temporary custody of his mother's cousin and temporarily suspending Mr. Caylor's visitation privileges, subject to a CPS determination of whether a no-contact order was appropriate.  *Id.*  On June 9, the court issued an order prohibiting Mr. Caylor from contact with his son.

On July 22, Mr. Caylor entered an Alford plea in King County Superior Court to resolve the criminal charges against him.  He pleaded guilty solely to a charge of felony harassment.  Ex. J.  In his statement supporting the plea, he wrote as follows:

> I am not guilty of this crime.  However, I have reviewed the police reports with my attorney, and believe there is substantial likelihood that I would be convicted of this and possibly another crime if I proceeded to trial.  I do not wish to take that risk.  Instead, I wish to take advantage of the prosecutor's plea offer.  I understand and agree that the court will consider the Certification for Determination of Probable Cause to establish a factual basis for the plea.

Ex. J.  There is no evidence regarding what, if anything, Mr. Caylor said during the plea colloquy.

Det. Mudd had, on May 26, prepared the probable cause statement to which Mr. Caylor referred.  Just as Det. Mudd had stated when he called CPS, the probable cause statement alleged that Mr. Caylor had "put the child in front of the door, so if police kicked the door in they would crush the child."  Ex. J.  The statement also contained the allegation regarding Mr. Caylor's threat to "put a 20-gauge slug though the front door."  *Id.*  Det. Mudd stated that Mr. Caylor had promised a "firefight" and a "bloodbath" if officers attempted to enter.  *Id.*  He also stated that Mr. Caylor had admitted there was a shotgun just inside his door.  *Id.*

ORDER – 8

Mr. Caylor's only comment about the contents of the probable cause statement was his written acknowledgement that "[f]or sentencing purposes" he "agree[d] to the accuracy of the [probable cause statement] except" for three corrections. Ex. J. He replaced the characterizations of Ms. Stillabower's claims with a version consistent with the transcript of her 911 call. *Id.* He disputed that he told officers he had put his son in front of the door, and instead offered a version consistent with his deposition testimony – that he had merely told officers that his son was near the door and that they would hurt him if they forced entry. *Id.* Finally, he contested that officers had actually heard the sound of a weapon from inside his apartment, conceding only that they believed they heard a weapon. *Id.* He pointed out that officers who searched his apartment after the shooting had discovered a toy that made the sound they had heard. *Id.* The court accepted his plea and apparently sentenced him to time already served. Mr. Caylor left jail on or about July 22.

It is not clear what Mr. Caylor did about his son immediately following his release. By August 28, Mr. Caylor signed an agreed order that kept the no-contact order in place pending an additional investigation, evaluation, and a hearing. Ex. T.

At an October 13 hearing, the state court issued an order granting Mr. Caylor visitation privileges. Ex. 25. The order rejected the assertions based on Det. Mudd's statements, finding that there was "no evidence presented to support that [Mr. Caylor] was holding a gun . . . or that he threatened the child directly." *Id.* It appears that Mr. Caylor's son remained in the custody of relatives until January 2010, when the court entered a stipulated order placing him in foster care. Ex. 26. In January 2011, the court dismissed the dependency action and returned the boy to Mr. Caylor's custody. Ex. 27.

In the aftermath of the shooting, SPD investigated it and on June 17 convened its Firearms Review Board ("FRB"). Mr. Caylor points to a host of deficiencies both in the SPD investigation preceding the FRB hearing and in the hearing itself. He contends, for

ORDER – 9

example, that SPD delayed the investigation for days, immediately gave a so-called *Garrity* order[2] to Ofc. Schubeck immunizing him from liability for his written statement following the shooting, and declined to conduct face-to-face interviews of any witnesses. In a July 20 report, the FRB concluded that Ofc. Schubeck had probable cause to believe Mr. Caylor "posed a serious threat of harm to others." Ex. 19 at 3.  To support that conclusion, the FRB cited (among other things) Mr. Caylor's alleged threat to "put a 20-gauge slug through the door," his statement that his shotgun was "right inside the door," and the sound officers heard that was consistent with the use of a shotgun. *Id.* at 2.  The FRB concluded that the shooting was justified. *Id.* at 3.  SPD Chief John Diaz concurred in that conclusion.  *Id.*

Mr. Caylor and his son filed this suit in 2011, claiming via 42 U.S.C. § 1983 that all of the officers on the scene violated their constitutional rights, as did the City of Seattle.  They also brought Washington-law outrage claims against the officers and Washington-law negligence claims against the City.  Since then, the parties have agreed to dismiss all claims except for those against the City, Ofc. Schubeck, and Ofc. Leslie. The City and Ofc. Schubeck jointly moved for summary judgment; Ofc. Leslie filed his own summary judgment motion.

## III.  ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show

---

[2] In *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967), the Supreme Court recognized that a government unit violates the Fifth Amendment's guarantee against self-incrimination when it forces one of its officers by threat of discipline or termination to make a potentially incriminating statement.  A *Garrity* order simultaneously requires an officer to make a statement and immunizes him from the use of that statement against him in a criminal case.

the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party must present probative evidence to support its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The court defers to neither party in resolving purely legal questions.  *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

In applying this standard to the motions before it, the court considers three sets of issues.  The court first considers whether Ofc. Schubeck or Ofc. Leslie violated the Constitution during the incident in question.  That inquiry focuses largely on whether Ofc. Schubeck used excessive force in violation of the Fourth Amendment and whether Ofc. Leslie can be held liable for that use of force.  It also, however, touches upon the Fourteenth Amendment right of Mr. Caylor's son to be free from interference with his relationship with his father.  The court also considers whether the officers violated the Fourth Amendment's prohibition on unreasonable searches.  The second set of issues relates to whether the City can be liable for its officers' acts either via § 1983 or Washington law.  Finally, the court will consider whether the City can be liable for Det. Mudd's conduct in the aftermath of the shooting.  Mr. Caylor believes that Det. Mudd's false statements to CPS led to the no-contact order.

**A.      Did Ofc. Schubeck or Ofc. Leslie Violate Plaintiffs' Constitutional Rights?**

Section 1983 provides a remedy for a plaintiff who proves that a defendant acting under color of state law violated her constitutional rights.  Ofc. Schubeck and Ofc. Leslie deny that they violated the Constitution.  They also invoke qualified immunity, which protects § 1983 defendants "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A

ORDER – 11

1    defendant successfully invokes qualified immunity either by showing that a plaintiff has

2    not alleged (or provided evidence for, depending on the stage of litigation) facts

3    amounting to a violation of a constitutional right or that the right was not "clearly

4    established" at the time of the defendant's violation.  *Pearson v. Callahan*, 555 U.S. 223,

5    231 (2009).  A court has discretion to consider either portion of the qualified immunity

6    test first.  *Id.* at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001)).

7            **1.    Judicial Estoppel**

8            Ordinarily, the summary judgment standard demands that the court adopt the non-

9    moving party's version of the facts.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  *Scott*

10   asked the Supreme Court to determine whether a police officer used excessive force

11   when he ended a high-speed car chase by rear-ending the plaintiff's car with his patrol

12   car, causing an accident that left the plaintiff a quadriplegic.  The *Scott* Court departed

13   from ordinary summary judgment practice because an undisputedly accurate videotape

14   sharply contradicted the plaintiff's version of events.  *Id.* at 378-80.

15           In this case, the Defendants ask the court not to accept Mr. Caylor's version of

16   events because he is judicially estopped from contesting the version he relied on in his

17   Alford plea.[3]  If Mr. Caylor were bound to that version of events, he would be unable to

18   contest that he threatened to use a shotgun against the officers, and he would be unable to

19   contest that he deliberately placed his son near the front door as a type of human shield.

20           Judicial estoppel permits a court, in its equitable discretion, to prevent a party

21   from making improper use of the courts by relying on a position to her benefit in one

22   court proceeding, then attempting to rely on an inconsistent position to her benefit in a

---

[3] At oral argument, Ofc. Schubeck's counsel suggested that because Mr. Caylor tested positive for drugs and alcohol at the hospital following the shooting, the court should be wary of accepting his version of the facts.  Counsel cited no authority for the notion that a court can disregard the well-worn summary judgment standard in cases of intoxication or drug use, and the court is aware of none.  The court also notes that because there is no evidence at all that officers on the scene suspected Mr. Caylor of being under the influence of drugs or alcohol, it is not relevant to the court's analysis of Mr. Caylor's constitutional claims.

ORDER – 12

second court proceeding.  *See New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001).

Judicial estoppel is flexible, fact-specific, and not reducible to an "exhaustive formula."

*Id.* at 751.  Typically, a court considers whether the party has adopted clearly inconsistent

positions, whether she succeeded in the first instance in persuading a court to adopt her

position, and whether she would gain an "unfair advantage or impose an unfair detriment

on the opposing party if not estopped."  *Id.* at 750-51.  The Ninth Circuit "follow[s] th[e]

blueprint" the Supreme Court established in *New Hampshire*.  *United Nat'l Ins. Co. v.

Spectrum Worldwide, Inc.*, 555 F.3d 772, 779 (9th Cir. 2009).

So far as the court is aware, the Ninth Circuit has not considered the application of

judicial estoppel to statements made in connection with a guilty plea.  Still, there seems

no reason to apply the doctrine differently in this context, and other circuits have done so.

*E.g.*, *Thore v. Howe*, 466 F.3d 173, 187 (1st Cir. 2006) (affirming application of judicial

estoppel based on guilty plea); *Lowery v. Stovall*, 92 F.3d 219, 224-25 (4th Cir. 1996)

(same); *Bradford v. Wiggins*, 516 F.3d 1189, 1193, 1195 (10th Cir. 2008) (affirming

application of doctrine following no-contest plea); *Zinkand v. Brown*, 478 F.3d 634, 637-

38 (4th Cir. 2007) (reversing trial court that applied the doctrine following an Alford

plea); *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1068-69 (10th Cir. 2005) (applying

judicial estoppel sua sponte to plea in abeyance).  None of those courts, however, applied

judicial estoppel reflexively in the wake of a guilty plea.  Each of them emphasized that a

plea itself is not dispositive, and that the circumstances in which the plea was made are

critical.  *E.g.*, *Bradford*, 516 F.3d at 1194 n.3 ("Applying judicial estoppel narrowly and

cautiously, as we must, we do not hold it to be dispositive that the [plaintiffs] simply

entered a no contest plea."); *See Thore*, 466 F.3d at 185 ("[W]e reject the notion that

judicial estoppel automatically applies to facts admitted during guilty pleas.").

As the court has noted, the version of facts presented in the probable cause

statement are inconsistent with the version of facts Mr. Caylor offers today.  Of course,

ORDER – 13

the probable cause statement is not Mr. Caylor's statement, it is Det. Mudd's.  For

purposes of his Alford plea, Mr. Caylor did not adopt or admit Det. Mudd's statement, he

merely acknowledged that the court would consider that statement "to establish a factual

basis for the plea."  In other words, in order to gain the benefit of the plea, Mr. Caylor

expressly admitted nothing.  *Cf. Lowery*, 92 F.3d at 225 ("The trial judge asked

[defendant] whether each of the assertions in the statement accompanying his guilty plea

was true, rather than whether he merely understood the statements.").  Moreover,

Washington law gave Mr. Caylor that option.  A trial court need only be "satisfied that

there is a factual basis for the plea" before accepting a plea of guilty.  Wash. CrR. 4.2(d).

The defendant need not admit anything.  *State v. Newton*, 552 P.2d 682, 685-86 (Wash.

1976).  Washington does not afford collateral estoppel effect to convictions following

Alford pleas because "the defendant, by entering an *Alford* plea, has not admitted

committing the crime."  *Clark v. Baines*, 84 P.3d 245, 250 (Wash. 2004).  A federal

court, considering whether to apply judicial estoppel, should not manufacture admissions

from an Alford plea that contains none.  To be sure, a defendant may make explicit

admissions during the course of an Alford plea, and those admissions may give rise to

judicial estoppel.  *See Bradford*, 516 F.3d at 1195 (finding judicial estoppel following no-

contest plea because the defendants explicitly admitted at plea colloquy to facts

establishing disorderly conduct).  In this case, however, Mr. Caylor made no admission.

Mr. Caylor was able to obtain the advantage of a guilty plea (the dismissal of some

charges and a favorable sentencing recommendation) without admitting anything.[4]

---

[4] The court need not decide whether an Alford plea, like a traditional guilty plea, serves at least
as a judicial admission to the essential elements of the crime. *Cf. Brosseau v. Haugen*, 543 U.S.
194, 197 (2004) (noting that by pleading guilty to felony "eluding" in violation of Washington
law, plaintiff admitted statutory elements of crime).  In this case, Mr. Caylor has already
admitted to the elements of felony harassment.  He admits that he threatened to fight officers if
they came through his door, in violation of RCW § 9A.46.020.  *See* RCW § 9A.46.020(1)(a)(i)
(harassment requires a threat to "cause bodily injury immediately or in the future"), RCW
§ 9A.46.020(2)(b) (harassment is a felony if a threat is made to a "criminal justice participant
who is performing his or her official duties").  No aspect of Mr. Caylor's claims today requires
him to repudiate his conviction for harassment.

ORDER – 14

Mr. Caylor did, however, at least arguably make admissions to portions of the probable cause statement "for sentencing purposes." Ex. J.  But the court cannot ignore the context of those admissions.  His guilt was not in dispute, so any admission he made was solely for the purpose of ensuring a more lenient sentence.  Thus he made explicit admissions, as the court has described, that softened several of the allegations in the probable cause statement.  The court might well hold him to those admissions, except none of them are inconsistent with the evidence he presents today.  He disputed (as he does today) that he ever used his son as a human shield.  He disputed (as he does today) that the sounds the officers heard came from a weapon.  He did not admit that he threatened to use a shotgun, that he told officers he would shoot through the door, that he told anyone his shotgun was "just inside the door," or that he made any other statements that implied he threatened to use a weapon against an officer or anyone else.  Even if the court were to construe the presence of those statements in the probable cause statement as admissions, Mr. Caylor gained no advantage from those admissions.  As noted, he had gained the advantage of a guilty plea by making no admission at all.  Admissions of aggravating circumstances for sentencing purposes, even if Mr. Caylor had actually made them, are not admissions Mr. Caylor made to gain an advantage.

The court declines to judicially estop Mr. Caylor from offering testimony inconsistent with the statement of probable cause.[5]  For that reason, the court relies on Mr. Caylor's version of events (at least where he has supported it with evidence) in assessing the summary judgment motions.

---

[5] Defendants also ask the court to give estoppel effect to the admissions Mr. Caylor made in the agreed dependency order the state court entered in August 2009. Ex. T.  That order contains no admissions inconsistent with Mr. Caylor's current position.  It makes no admission regarding his use or possession of a shotgun, it repeats Mr. Caylor's version of what he told officers about his son in front of the door, and it contains no admissions that Mr. Caylor threatened to hurt anyone. *Id.*

ORDER – 15

## 2.     Unlawful Entry or Seizure

Although the focus of Mr. Caylor's constitutional claims is on Ofc. Schubeck's use of force, he also contends that officers violated the Fourth Amendment by "demand[ing] that he leave his home or allow them to enter without a warrant or other lawful justification."  Pltfs.' Opp'n (Dkt. # 79) at 20.  Mr. Caylor does not contest that the officers lawfully entered the apartment after Ofc. Schubeck shot him.  *Id.*  Mr. Caylor chastises the officers for not recognizing this Fourth Amendment claim, but it appears nowhere in Plaintiffs' complaint.  Put another way, the court would have had no idea Mr. Caylor was raising this claim if he had not identified it, for the first time, in his opposition to the summary judgment motions.

Rather than reward Mr. Caylor for pleadings that failed to apprise anyone of this Fourth Amendment claim, the court addresses it sua sponte.  To begin, the court knows of no authority holding that a request or demand to enter a home, without actual entry, even implicates the Fourth Amendment.  In other contexts, it is plain that the Fourth Amendment does not apply to mere requests.  *See, e.g., United States v. Drayton*, 536 U.S. 194, 201 (2001) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage -- provided they do not induce cooperation by coercive means.").  Absent authority making it clear to officers that demands to enter a home violate the Fourth Amendment, the officers are, at a minimum, entitled to qualified immunity.

Even assuming that a request to enter a home implicates the Fourth Amendment, it would not violate the Fourth Amendment on these facts.  When officers arrived on the scene, Ms. Stillabower had informed them that Mr. Caylor was threatening suicide, and explained the circumstances of those threats.  Although the Fourth Amendment typically requires a warrant before entering a home, there is an exception where officers have an objectively reasonable basis to believe there is an immediate need to protect others from

ORDER – 16

1    serious harm.  *Hopkins v. Bonvicino*, 573 F.3d 752, 763-64 (9th Cir. 2009) (addressing

2    "community caretaker" exception to warrant requirement).  The court need not decide

3    whether circumstances justified a warrantless entry into Mr. Caylor's home to prevent

4    him from killing himself.  It suffices to conclude that no clearly established law would

5    have put a reasonable officer on notice that he could not demand entry knowing what the

6    officers outside Mr. Caylor's apartment knew.  The officers' demand to enter Mr.

7    Caylor's apartment was either lawful or not clearly unlawful.

8         **3.    Excessive Force**

9         Ofc. Schubeck's decision to shoot Mr. Caylor was a seizure within the meaning of

10   the Fourth Amendment, which governs both the lawfulness of a seizure and the means

11   used to accomplish it.  *See Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985).  As in any

12   Fourth Amendment case, the inquiry is whether the Ofc. Schubeck's actions were

13   reasonable, balancing Mr. Caylor's Fourth Amendment interests against the government

14   interests alleged to justify Ofc. Schubeck's intrusion.  *Id.*  Reasonableness is evaluated

15   objectively, by asking whether a reasonable officer confronted with the same

16   circumstances would have believed the intrusion reasonable.  The court considers three

17   principal factors to complete that inquiry in an excessive force case.  *Espinosa v. City &*

18   *County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010).  It evaluates the "severity of

19   the intrusion" by determining the degree of force used.  *Id.*  It then assesses the

20   government's interest by considering "(1) the severity of the crime; (2) whether the

21   suspect posed an immediate threat to the officers' or public's safety; and (3) whether the

22   suspect was resisting arrest or attempting to escape."  *Id.* (summarizing factors from

23   *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  These factors are not exclusive, and the

24   court may consider any factor relevant to the reasonableness inquiry.  *Glenn v.*

25   *Washington County*, 673 F.3d 864, 872 (9th Cir. 2011) ("Other relevant factors include

26   the availability of less intrusive alternatives to the force employed, whether proper

27

28   ORDER – 17

warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed."). For example, the court may consider the plaintiff's culpability in creating the circumstances that led to the use of force. *Scott*, 550 U.S. at 384. Ultimately, the court balances the government's interests against the individual's to determine whether the force was reasonable. *Espinosa*, 598 F.3d at 537.

At the outset, the court finds that Ofc. Schubeck used deadly force and intended to do so. Objectively, firing a sidearm at a person's head is deadly force. Moreover, Ofc. Schubeck's testimony leaves no doubt that his intent was to kill or seriously injure Mr. Caylor.

The difficult question is not the quantum of force Ofc. Schubeck used, but whether he had objective justification for his decision. In that regard, the "most important" factor is whether Mr. Caylor posed an immediate threat to the safety of officers or his son. *Glenn*, 673 F.3d at 872. Ofc. Schubeck was confronted with a man who had threatened to take his own life. His crime (which Mr. Caylor's conviction establishes) was threatening to fight officers, but only if they entered his home. He repeatedly refused officers' demands that he allow them to enter his home. He was solely responsible for creating the standoff between himself and the officers. Had he simply acceded to the officers' demands to enter his apartment, it is unlikely that Ofc. Schubeck would have considered the use of deadly force. Mr. Caylor was angry and agitated throughout the encounter, repeatedly cursing at the officers. He was with his young son, and had demonstrated, at least, a disregard for the boy's safety. Rather than taking his son and placing him in another room or otherwise out of harm's way, he told officers that if they forced entry, they ran the risk of seriously injuring him. Although this is a far cry from the "human shield" situation that some of the officers described, it is nonetheless conduct that showed disregard for his son's safety. He admitted that he had a shotgun in the

ORDER – 18

apartment, although he did not suggest he was preparing to use it.  Ofc. Schubeck (like many of the officers) had heard sounds that were consistent with "cycling" or "racking" a shotgun, but had no other indication that Mr. Caylor would use the weapon.[6]  Ofc. Schubeck twice observed Mr. Caylor on his patio, and each time he had no weapon.  Ofc. Schubeck, unlike every other officer on the scene, had actually seen Mr. Caylor's son. Not only was the boy playing without apparent distress, his presence on the patio belied any belief that Mr. Caylor was keeping the boy near the front door as a human shield.

Ofc. Schubeck testified that an additional reason he believed the boy was in grave danger was "common knowledge that people frequently will do a murder-suicide."  Ex. 2 (Schubeck Dep. at 86).  Ofc. Schubeck was unable, however, to point to any objective basis for his belief that suicidal people frequently kill others.  Ex. H (Schubeck Dep. at 92-93).  Ultimately, he explained his belief as follows: "You have to understand I've been a police officer for 21 years, so I can't nail it down exactly.  Somewhere in my 21-year career murder-suicides have been discussed, so that's all I can say on that." *Id*. at 93.  No Defendant offers any evidence supporting the notion that it is objectively reasonable to suspect that a homicide will occur when a person threatens suicide and someone else is present.  The court therefore declines to afford Ofc. Schubeck's suspicion more than minimal weight in assessing the objective reasonableness of his decision to shoot.

Based his assessment of the facts, Ofc. Schubeck formed the belief that Mr. Caylor was likely to seriously hurt his son.  It was because of that belief that he determined, after

---

[6] The court queries what conclusions it may draw, especially at the summary judgment stage, from the officers' reports regarding the "racking" or "cycling" sound.  Of the many officers who testified that they heard the sound, only Ofc. Miller testified that he concluded, based on the sound, that Mr. Caylor was holding a weapon.  Ex. D (Miller Dep. at 56).  The others, including Ofc. Schubeck, merely testified that it sounded like a shotgun, without testifying as to whether they drew any conclusions about whether Mr. Caylor was holding a weapon.  On this record, it is not clear that a reasonable officer would have made that conclusion.  For purposes of this order only, the court assumes that Ofc. Schubeck reasonably believed that Mr. Caylor had "racked" or "cycled" a shotgun.

ORDER – 19

his initial face-to-face contact with Mr. Caylor, that if Mr. Caylor reappeared on the patio, he would shoot him rather than let him go back inside.  There is no evidence to suggest that Ofc. Schubeck's belief that the boy was in danger was anything but sincere.

The Fourth Amendment, however, does not authorize the use of deadly force whenever an officer sincerely believes that others face a threat of harm; it demands that the officer's belief be objectively reasonable.  *Price v. Sery*, 513 F.3d 962, 967 (9th Cir. 2008).  The court concludes, constrained by its acceptance of Mr. Caylor's version of the facts, that a jury could find that no reasonable officer would have concluded that Mr. Caylor's son or the officers faced a threat of imminent harm sufficient to justify the use of deadly force.  Officers believed only that Mr. Caylor had a shotgun and that at some point he had "cycled" or "racked" it.  He had not displayed the shotgun; he had not explicitly threatened to use it on himself, his son, or the officers.  The court finds nothing that would permit it to conclude as a matter of law that a reasonable officer would have believed it likely that Mr. Caylor would use the shotgun.  The officers make much of Mr. Caylor's "suicide by cop" comment, but the circumstances make it debatable (at least) that it was reasonable to infer from that comment (coupled with all of the other circumstances) that the boy or the officers were at risk.[7]  The mere presence of a weapon, even a weapon that a suspect is actually brandishing, is not a sufficient basis to use deadly force.  *Harris v. Roderick*, 126 F.3d 1189, 1202 (9th Cir. 1997) (holding, in review of case arising from Ruby Ridge standoff, that directive to kill any armed adult male was unconstitutional); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) ("[O]fficers could not reasonably have believed the use of deadly force was lawful because [plaintiff] did not point the gun at the officers and apparently was not facing them when they shot him the first time.").  The officers' refusal to warn Mr. Caylor is

---

[7] No one suggests that Ofc. Schubeck shot Mr. Caylor to keep him from taking his own life, nor that it would be reasonable to do so.  *See Glenn*, 673 F.3d at 872 ("[I]t would be odd to permit officers to use force capable of causing serious injury or death in an effort to prevent the possibility that an individual might attempt to harm only himself.").

ORDER – 20

another factor mitigating against a finding that Ofc. Schubeck acted reasonably.  The court acknowledges that Ofc. Schubeck feared that a warning might provoke Mr. Caylor to harm his son, Ex. H (Schubeck Dep. at 110-11), but a jury must decide if that fear was objectively reasonable.  *See Deorle v. Rutherford*, 272 F.3d 1272, 1284 (explaining that "warnings should be given, when feasible, if the use of force may result in serious injury").[8]

For all of these reasons, the court's assessment of the totality of circumstances confronting Ofc. Schubeck leaves it unable to conclude that his shot was "undisputably reasonable."  *Glenn*, 673 F.3d at 864.  The court accordingly cannot grant judgment as a matter of law that Ofc. Schubeck's use of force complied with the Fourth Amendment.

To determine whether Ofc. Schubeck can take shelter in qualified immunity, the court must ask whether clearly established appellate authority prohibited him from shooting.  *Blanford*, 406 F.3d at 1119 (granting qualified immunity where "neither Supreme Court nor circuit precedent in existence as of [the date of the incident] would have put a reasonable officer in [defendant]s' position on notice that using deadly force in the particular circumstances would violate [plaintiff's] Fourth Amendment rights").  The court must examine clearly established law "in light of the specific context of the case, not as a broad general proposition."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier*, 533 U.S. at 201).  Only in an "obvious case" do the generalized use-of-force standards announced in *Graham* and *Garner* serve as clearly established law. *Brosseau*, 543 U.S. at 199.  Nonetheless, officers cannot claim qualified immunity "simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct."  *Deorle*, 272 F.3d at 1286.

---

[8] Plaintiffs, seizing on a dictionary definition of "feasible," contend that because it was possible for Ofc. Schubeck to warn Mr. Caylor, a belief that the warning would result in harm to his son is irrelevant.  Plaintiffs eschew the Fourth Amendment touchstone of reasonableness in favor of Merriam-Webster.  It is not merely unreasonable to suggest that an officer must warn a suspect of imminent deadly force when the officer reasonably believes the warning will result in harm to an innocent person, it is absurd.

ORDER – 21

In this case, clearly established law would inform a reasonable officer in Ofc. Schubeck's position that he could not shoot a man in Mr. Caylor's position unless he posed a risk of harm to his son or to the officers. The court has already held that a jury could find that it was not reasonable to believe that Mr. Caylor posed a threat of immediate harm. It is not clear whether Ofc. Schubeck or any other Defendant seriously contends that Ofc. Schubeck would not have known it was unlawful to shoot Mr. Caylor absent a threat of harm. At oral argument, the officers made much of the Supreme Court's decision in *Scott*, which rejected the notion that *Garner* established inflexible prerequisites to the use of deadly force. 550 U.S. at 382 ("*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'"). Yet the *Scott* court found that an officer's decision to use his patrol car to rear end a suspect in a high-speed car chase was reasonable, despite the risk of injury, precisely because the chase "threatened the lives of innocent bystanders . . . ." *Scott* is thus not inconsistent with Ninth Circuit precedent requiring a threat of serious harm to justify the use of deadly force. *See Harris*, 126 F.3d at 1201; *Haugen v. Brosseau*, 351 F.3d 372, 392 (9th Cir. 2003).[9] That precedent was sufficient to advise any reasonable officer in Ofc. Schubeck's position, assuming the jury finds the facts as Mr. Caylor presents them, that he could not lawfully shoot.

*Harris v. Roderick* provides additional specific guidance as to the lawfulness of Ofc. Schubeck's shot. *Harris* involved a team of federal agents surrounding a cabin following an armed standoff just over a day prior. During the previous day, the plaintiff had shot and killed a law enforcement officer before fleeing to the cabin. Unaware that agents had surrounded the cabin, the armed plaintiff and two other people moved from the cabin to another building. *Id.* at 1193, 1203. Without warning, an agent shot one of

---

[9] The Supreme Court reversed the Ninth Circuit's denial of qualified immunity in *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). But the Court "express[ed] no view as to the correctness of the Court of Appeals' decision on the constitutional question itself." *Id.*

ORDER – 22

his companions, causing the plaintiff and another person to run back toward the cabin. *Id.* The agent shot again, seriously injuring the plaintiff. The agent later explained that he believed that the plaintiff would pose a greater danger to the agents if he made it back inside the cabin. *Id.* at 1203. Applying *Graham*, *Garner*, and Ninth Circuit precedent, the court held that it was unlawful to shoot the plaintiff, although he was armed and had killed an agent the day before, where the plaintiff was fleeing inside a building and not threatening the agents. *Id.* Even at the time (more than 12 years prior to the shooting of Mr. Caylor), the *Harris* court found that clearly established law prohibited the shooting. *Id.*

No reasonable officer could believe, in light of *Harris*, that the law permitted Ofc. Schubeck to shoot Mr. Caylor. The plaintiff in *Harris* was actually armed at the time of the shooting, and had already killed a law enforcement officer. Nonetheless, it was unconstitutional to use deadly force where he was not actively threatening to hurt officers. The agent's belief that the plaintiff would pose a greater danger once he was inside the residence (much as Ofc. Schubeck believed Mr. Caylor posed a danger to his son if he were to go back inside) was insufficient to justify his decision to shoot. Mr. Caylor, by contrast, was not armed, he was merely near an apartment in which officers reasonably believed a shotgun was located. He was not threatening officers or his son. In light of *Harris*, no reasonable officer could have believed the law justified a shooting (accepting the facts as Mr. Caylor presents them).

Before moving to the claim against Ofc. Leslie, the court rejects Mr. Caylor's request that the court grant summary judgment that the shooting was unconstitutional. This request is specious. If, for example, the jury merely believes Ofc. Schubeck's testimony that Mr. Caylor's last words were "I'm getting my gun," then Ofc. Schubeck likely did not act unconstitutionally. Indeed, if the jury were to resolve any of the key

ORDER – 23

factual disputes regarding Mr. Caylor's threat to use a weapon in Ofc. Schubeck's favor, it might well be obligated as a matter of law to conclude that the shot was reasonable.

### 4.        Excessive Force – Ofc. Leslie

Ofc. Leslie, like all law enforcement officers, "ha[s] a duty to intercede when [his] fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994); *see also Motley v. Parks*, 383 F.3d 1058, 1071 (9th Cir. 2004) (denying summary judgment in § 1983 claim for officers who failed to intercede in harassment during a search); *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000) (acknowledging, in evaluation of § 1983 claim, duty to intercede).  An officer who abrogates his duty to intercede to prevent a constitutional violation is as liable as the officer who commits the violation. *Koon*, 34 F.3d at 1447 n.25.

When Ofc. Leslie joined Ofc. Schubeck on the landing, he knew everything Ofc. Schubeck knew, with one exception.  Although he had arrived at the apartment later than Ofc. Schubeck, he knew either through direct observation or by communication with other officers all of the pertinent facts regarding the situation.  The exception is that he had not witnessed Mr. Caylor's initial appearance on the balcony with his son.  Ofc. Leslie arguably had better justification for believing deadly force was necessary because he was likely unaware that they boy had previously appeared on the balcony in no distress.  Still, a jury could conclude that a reasonable officer who knew what Ofc. Leslie knew would not have believed deadly force was reasonable.

When Ofc. Schubeck informed him of his intent to shoot Mr. Caylor, Ofc. Leslie did nothing but tell Ofc. Schubeck not to miss.  A jury could reasonably conclude that Ofc. Leslie encouraged Ofc. Schubeck to shoot.  A jury could hardly help but conclude, however, that Ofc. Schubeck did nothing to intervene.  And a jury could reject Ofc. Leslie's contention that he did not intervene because he did not believe that Ofc.

ORDER – 24

Schubeck would shoot.  Because the circumstances known to Ofc. Leslie did not justify the use of deadly force, and because Ofc. Schubeck's announcement of his intent to shoot offered Ofc. Leslie ample time to intercede, a jury could find that he is also liable for the use of excessive force.  The duty to intercede to prevent constitutional violations was established at the time of the shooting.  Ofc. Schubeck is therefore not entitled to qualified immunity for his decision not to intercede.  Assuming that Ofc. Leslie believed the decision to shoot was reasonable, he is not entitled to qualified immunity for reasons the court has already discussed.

Because it would appear to make no difference to the outcome of this order, the court does not address Mr. Caylor's contention that Ofc. Leslie had a separate duty to warn Mr. Caylor before Ofc. Schubeck shot.

### 5.   Fourteenth Amendment Claim Based on Interference with the Caylors' Familial Relationship

Plaintiffs' complaint plainly advises Defendants of a claim for "interfering with and damaging the Plaintiff[s'] liberty interest in their familial, parent-child relationship." Defendants nonetheless did not target this claim in their summary judgment motions.

The Fourteenth Amendment protects a right of family members to associate with each other.  *Porter*, 546 F.3d at 1136.  A plaintiff may assert a violation of that right where excessive force against a family member deprives them of familial association. The target of the excessive force, however, has no Fourteenth Amendment claim.  *See Curnow*, 952 F.2d at 325; *see also Graham*, 490 U.S. at 395 (holding that more specific guarantees of Fourth Amendment, rather than the Fourteenth Amendment, govern the constitutional claims of a victim of excessive force).  To the extent Plaintiffs assert that Mr. Caylor has a Fourteenth Amendment claim, they are mistaken.

An officer violates the right of familial association only by acting in a matter that shocks the conscience.  *Id.* at 1137.  What sort of conduct meets that standard depends in part on whether the challenged conduct occurs after a period in which actual deliberation

ORDER – 25

is practical, or whether it occurs in a situation that "escalate[s] so quickly that the officer must make a snap judgment." *Id.* Unlike the Fourth Amendment inquiry, the Fourteenth Amendment inquiry has both objective and subjective components. *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844-45 (9th Cir. 2010). The court is unaware of any case in which an officer acting with a subjective intent to prevent harm to a child was held to have acted with deliberate indifference.

The court declines to pass judgment on Mr. Caylor's son's Fourteenth Amendment claim. Defendants' failure to address it means that the court will not foreclose its presentation at trial.

**B.     Is the City Liable?**

Plaintiffs concede, as they must, that the City can be liable for its officers' § 1983 violations only in certain circumstances. For example, when a city's policy or custom causes its agents' violation of a plaintiff's constitutional rights, the city itself is liable. *Price*, 513 F.3d at 966 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Alternatively, when an official with "final policy-making authority" ratifies a subordinate's unconstitutional act, the city can be held liable. *Price*, 513 F.3d at 966.

Plaintiffs point to a host of City policies that they believe underlie the constitutional violations here. They decry training skewed toward the use of force and away from de-escalation skills, they bemoan the City's failure to provide more CIT officers, they contend that the FRB is merely a rubber stamp for unlawful shootings, and they suggest that the City's written use-of-force policy authorizes the use of deadly force without an imminent deadly threat. The court does not decide whether Plaintiffs accurately characterize any of the City's policies. Their § 1983 claim based on those policies fails for a different reason – there is no evidence that these policies caused Ofc. Schubeck to shoot Mr. Caylor. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012) ("Under *Monell*, a plaintiff must also show that the policy at issue was the

ORDER – 26

'actionable cause' of the constitutional violation, which requires showing both but-for and proximate causation."); *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (same).

On the record before the court, Ofc. Schubeck undisputedly shot Mr. Caylor because he believed Mr. Caylor was going to kill or seriously injure his son. That belief may have been mistaken, and the court has already acknowledged that a jury could conclude that no reasonable officer would have formed a similar belief. But there is no evidence that Ofc. Schubeck formed that belief as a result of the City's policies. Take, for example, Plaintiffs' insistence that City policy permits the use of deadly force without an imminent threat to life. Assuming Plaintiffs accurately characterize the policy, Ofc. Schubeck was not following it.[10] He did not shoot because he believed he could do so without an imminent threat, he shot because he believed Mr. Caylor's son's life was in imminent danger. Similarly, Plaintiffs offer no evidence that better de-escalation training would have affected Ofc. Schubeck's belief regarding the threat to the boy. *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989) ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training . . . . Such a claim could be made about almost any encounter resulting in injury . . . ."). If the City were to design a perfect post-shooting review and investigation procedure, there is no evidence it would prevent Ofc. Schubeck or any other officer from shooting to protect the life of others. Finally, even if the court were to hold that the City's inadequate investigations of shootings (and subsequent failure to discipline officers who shoot) had the effect of emboldening officers, no reasonable jury could conclude that effect played a role in Ofc. Schubeck's decision to shoot to protect Mr. Caylor's son.

---

[10] Plaintiffs ask the court to grant summary judgment that the City's use-of-force policy is unconstitutional because it permits the use of deadly force without an immediate threat of harm. The court declines to render an advisory opinion.

ORDER – 27

The court could go on, but it suffices to summarize by observing that Plaintiffs point to a host of SPD policies, but do very little to explain (much less prove) how those policies led to the shooting.  It is not enough to point to a policy and posit a connection between it and a constitutional violation.  To do so would render *Monell* a "dead letter." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any . . . harm inflicted by a municipal official; for example [the defendant officer] would never have killed [the suspect] if [the city] did not have a 'policy' of establishing a police force.").  Because of the lack of a causal link between the SPD's policies and Ofc. Schubeck's decision, the court grants summary judgment in the City's favor on Plaintiffs' § 1983 claims.  For the same reasons, the court concludes that Plaintiffs' Washington-law negligent-training claim against the City fails as a matter of law.

Plaintiffs' claim that SPD Chief John Diaz ratified an unconstitutional shooting is also lacking in evidentiary support.  Plaintiffs rely solely on Chief Diaz's bare signature concurring in the FRB's assessment of the shooting, along with four unremarkable pages of Chief Diaz's deposition testimony.  Unlike this court, Chief Diaz had no obligation to construe facts in the light most favorable to Mr. Caylor.  The evidence permits only the conclusion that Chief Diaz considered the disputed facts (with the assistance of the FRB) and decided that Ofc. Schubeck reasonably believed that Mr. Caylor posed a serious and immediate threat to his son.  Chief Diaz did not ratify an unconstitutional decision, he ratified a constitutional one.

## C.   Is the City Liable for the No-Contact Order?

Lastly, the court considers whether the City can be liable for negligent investigation.  The court addressed this claim in its August 2, 2012 order granting the City's motion to dismiss.  The court explained in that order that Washington does not generally recognize the tort of negligent investigation.  Courts have held, however, that

ORDER – 28

provisions within RCW Ch. 26.44 create actionable duties to both children and parents when investigating child abuse.  *See Roberson v. Perez*, 123 P.3d 844, 850 (Wash. 2005). For example, in *Tyner v. Dep't of Soc. & Health Servs.*, 1 P.3d 1148, 1153-55 (Wash. 1998), the court held that RCW § 26.44.050, which mandates that the Department of Social and Health Services ("DSHS") investigate any "report concerning the possible occurrence of abuse or neglect," imposed an actionable duty on DSHS workers.  That duty applies not only to DSHS workers, but to "law enforcement agenc[ies]."  RCW § 26.44.050; *see also Rodriguez v. Perez*, 994 P.2d 874, 878 (Wash. Ct. App. 2000).  The court thus concludes that Washington law permits a suit for negligent investigation by a law enforcement officer carrying out a child abuse investigation.

    In this case, the law enforcement officer in question is Det. Mudd, who investigated the shooting.  Det. Mudd had ample reason to be concerned about Mr. Caylor's son: he knew at a minimum that he would have no parent to care for him until Mr. Caylor left custody.  He also apparently concluded, however, that Mr. Caylor had used his son as a human shield and had threatened to kill his son.[11]  The court has already noted that any "human shield" characterization is questionable.  But to contend that Mr. Caylor threatened to kill his son is to contradict every officer who was on the scene, all of whom admit that Mr. Caylor never threatened to harm his son.  There is thus ample evidence that Det. Mudd's statement was the result of a negligent (at best) investigation. A jury could reasonably find, moreover, that the no-contact order was the result of that investigation.[12]

---

[11] The only evidence in the record of Det. Mudd's statement is the DSHS intake form, which a DSHS worker prepared.  The City's summary judgment motion made no objection to the statement.  At oral argument, the City's counsel contended that the statement was hearsay. Rather than address a late evidentiary objection, the court assumes that Plaintiffs will be able, at trial, to present admissible evidence of Det. Mudd's statement.

[12] Ofc. Leslie, who is not a party to the negligent investigation claim, contends that Mr. Caylor is estopped by virtue of the state court orders from contesting that his son was dependent.  Putting aside that Ofc. Leslie has no reason to oppose a claim to which he is not a party, Mr. Caylor is not contesting the court's dependency decisions, he is contesting the no-contact order.

ORDER – 29

The damages arising from the negligent investigation are tightly constrained. From the day Mr. Caylor was shot until his release from custody on July 29, he had no opportunity to see his son, regardless of any court order.  The court lifted the no-contact order on October 13, after rejecting any suggestion that Mr. Caylor had threatened to harm his son.  Because the court rejected the statements Det. Mudd made conveying the results of his allegedly negligent investigation, Mr. Caylor cannot blame that investigation for any separation from his son after October 13.  In August, Mr. Caylor acceded to a temporary extension of the no-contact order, although the record does not permit the court to determine whether he had any realistic choice in that decision.

The evidence before the court would permit a jury to conclude that Mr. Caylor was kept from his son for at least part of the time between July 29 and October 13, 2009 as a direct consequence of Det. Mudd's negligent investigation.  The court accordingly permits this claim to proceed to the jury.

Finally, the court notes that Plaintiffs have presented a claim for outrage against the City, although it is not clear whether that claim belongs to both of them or solely to Mr. Caylor's son.  The court concludes that disputed issues of material fact prevent the court from resolving the outrage claim.  At a minimum, Plaintiffs shall clarify before trial whether both of them are pursuing this claim.

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS in part and DENIES in part the summary judgment motion of the City and Ofc. Schubeck (Dkt. # 65) and DENIES Ofc. Leslie's summary judgment motion (Dkt. # 62).  A jury will decide Mr. Caylor's § 1983 excessive force claim against Ofc. Schubeck and Ofc. Leslie, his son's § 1983 Fourteenth Amendment claim against the same officers, and Plaintiffs' negligent investigation and outrage claims against the City.  The court dismisses all other claims with prejudice.

ORDER – 30

1    The clerk will issue a separate order establishing a schedule for the submission of

2    motions in limine, jury instructions, and other pretrial matters.

3    Dated this 30th day of April, 2013.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 31